**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § § | CASE NO. 6:21-CV-00226-JCB-KNM |
| SDI OF MINEOLA, L.L.C., d/b/a SONIC-DRIVE IN & SDI OF WHITEHOUSE, L.L.C., d/b/a SONIC DRIVE-IN | § § § | |
| *Defendants.* | | |

**REPORT & RECOMMENDATION OF**
**THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are Defendants' Motion for Summary Judgment (Doc. No. 51), Plaintiff's Response in Opposition (Doc. No. 60), Defendants' Reply (Doc. No. 61), and Plaintiff's Sur-Reply (Doc. No. 62). Having considered the motion, the Parties' submissions, and the relevant law, the Court **RECOMMENDS DENYING** Defendants' motion.

**BACKGROUND**

The Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") initiated this sexual harassment and hostile work environment action on behalf of Vanessa Spurgeon, Krystin McElya, Trinity Hollingsworth, Ashleigh Stein, Shelby Henson,[1] Lauren Crump, Gabrielle Jerome, Sage Mizer, and other aggrieved female employees ("Claimants").[2] Plaintiff alleges Defendants SDI of Mineola, L.L.C. d/b/a Sonic Drive-In ("SDI Mineola") & SDI of Whitehouse L.L.C. d/b/a Sonic Drive-In ("SDI Whitehouse") violated Title VII of the Civil Rights Act of 1964

---

[1] Pursuant to EEOC's Stipulation of Dismissal, all claims on behalf of Shelby Henson were dismissed without prejudice. Doc. No. 47.
[2] Claimants have exhausted their administrative remedies. Parties' Joint Stipulation, Doc. No. 65 at ¶ 2.

and Title I of the Civil Rights Act of 1991.[3] Specifically, Plaintiff alleges that SDI Mineola discriminated against Hollingsworth, Crump, Jerome, Mizer, and other aggrieved female employees by subjecting them to sexual harassment, ultimately leading to Spurgeon's constructive discharge. Plaintiff also alleges that SDI Whitehouse discriminated against Stein by subjecting her to sexual harassment, ultimately leading to her constructive discharge, and alleges that SDI Whitehouse subjected other aggrieved female employees to a hostile work environment based on sex.[4] The EEOC asserts that Leston Juarez ("LJ"), the former co-manager of SDI Mineola and former general manager of SDI-Whitehouse, sexually harassed all claimants.[5] Plaintiff seeks monetary relief for all claimants, as well as injunctive relief and punitive damages.

Defendants moved for summary judgment on the following grounds: (1) EEOC cannot establish a *prima facie* case for hostile work environment based on sexual harassment for all claimants; (2) EEOC cannot prove constructive discharge for Spurgeon and/or Stein; (3) Defendants assert they are entitled to the *Ellerth/Faragher* affirmative defense; (4) EEOC cannot prove that Defendants and other McQuilliams-owned entities are an integrated enterprise under Title VII; (4) Plaintiffs cannot prove that any Plaintiff is entitled to recover punitive damages under Title VII; and (5) EEOC cannot prove that certain claimants suffered noneconomic damages.[6]

Specifically, as to Plaintiff's *prima facie* claim for hostile work environment, Defendants argue that LJ's behavior was not severe or pervasive and that the complained of conduct was not based on sex. Defendants also assert that Spurgeon and Stein cannot prove constructive discharge because the evidence shows that they resigned for non-harassment reasons, and further, that LJ's

---

[3] Pl.'s Third Amend. Compl., Doc. No. 41.
[4] Pursuant to the Parties' Joint Stipulation, the EEOC no longer pursues the constructive discharge and related backpay claims on behalf of Krystin McElyea and Gabrielle Jerome. *See* Doc. No. 59.
[5] Claimants are former employees who worked as carhops or "middle" crew members. Pl.'s Resp., Doc. No. 60 at 3–4.
[6] Defs.' Mot. Summ. J., Doc. No. 51; Defs.' Reply, Doc. No 61.

behavior does not meet the required level of severity. As to the *Ellerth/Faragher* affirmative defense, Defendants contend that they maintained a reasonable and appropriate written harassment policy and that each claimant failed to take advantage of any preventative or corrective opportunities provided by Defendants, and otherwise failed to avoid harm by neglecting to report LJ's behavior while he was still their manager. Defendants further state that they (along with any other McQuilliams-owned SDI entity) are not an integrated enterprise single employer for Title VII purposes, and assert that the only *Trevino* factor present in this case is common ownership. As to punitive damages, Defendants state that the EEOC cannot prove that they acted with malice or reckless indifference as required, when no owner or member of upper management had knowledge of the conduct at issue. Finally, Defendants assert that Spurgeon, McElyea, Crump, and Mizer fail to state a specific discernable injury as to their emotional state that is supported with competent evidence regarding the nature, extent, and duration of the alleged harm they claim to have sustained as a result of the alleged sexual harassment.

In its Response, the EEOC asserts that it has stated a *prima facie* claim for sexual harassment for all claimants.[7] The EEOC states that LJ's harassment was based on the claimants' sex (female) because he primarily targeted women, and further asserts that LJ's conduct was frequent, severe, threatening, and altered the work environment. Plaintiff next asserts that Spurgeon and Stein's claims for constructive discharge require only that they felt compelled to resign due to LJ's harassment. Plaintiff further responds that Defendants are not entitled to the *Ellerth/Faragher* affirmative defense because there are genuine issues of material fact regarding the dissemination of Defendants' policy against sexual harassment and conflicting evidence as to whether claimants reported LJ's behavior. As to the EEOC's integrated enterprise claim, Plaintiff

---

[7] Pl.'s Resp., Doc. No 60; Pl.'s Sur-Reply, Doc. No. 62.

states that there is a question of material fact as to whether the McQuilliams' franchise operations were highly interrelated, centrally controlled, commonly managed, and commonly owned. Finally, the EEOC asserts that each claimant adequately alleged an injury as required to establish non-economic damages, and that Defendants are not entitled to summary judgment on the EEOC's claim for punitive damages because there is a question of material fact regarding whether Defendants made a good faith effort to protect claimants' federally protected rights.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings and evidence show that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "material fact" is one that might affect the outcome of the suit under governing law. *Id.* Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Id.* When ruling on a motion for summary judgment, the Court must make all inferences from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party may meet its burden by pointing to the absence of evidence supporting any claim. *Celotex Corp.*, 477 U.S. at 325.

If the movant meets its burden, the nonmovant must go beyond the pleadings and set forth specific facts in the record sufficient to support his claim. *Anderson*, 477 U.S. at 257. The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated

4

assertions, metaphysical doubt as to the factors, or a mere scintilla of evidence. *Matsushita*, 475 U.S. at 585; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmovant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "The nonmovant is also required to articulate the precise manner in which the submitted or identified evidence supports his or her claim." *Smith v. United States*, 392 F.3d 621, 625 (5th Cir. 2004).

Summary judgment is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987). The district court must look to the full record, including the pleadings, affidavits, and depositions. *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Under this standard, fact questions are considered with deference to the nonmovant. *Reid v. State Farm Mutl. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The evidence of the nonmovant is to be believed and all inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The Court resolves factual controversies for purposes of summary judgment in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little*, 37 F.3d at 1075. The Court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. *Wallace*, 80 F.3d at 1048 (citing *Little*, 37 F.3d at 1075).

## ANALYSIS

### A.      Hostile Work Environment

Defendants assert they are entitled to summary judgment on the EEOC's sexual harassment hostile work environment claims on behalf of Spurgeon, McElyea, Crump, Jerome, Mizner, and

Stein. Specifically, Defendants move for summary judgment on two elements: whether harassment was based on the claimants' sex (female) and whether LJ's harassment was so severe or pervasive that it affected a term, condition, or privilege of employment.[8]

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), prohibits "discriminat[ion] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's. . . sex." A hostile work environment due to sexual harassment is discrimination based on sex. *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 188 (5th Cir. 2012). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022) (quoting 42 U.S.C. § 2000e-5(e)(1)). To survive summary judgment on a hostile work environment claim, the EEOC must show as to each claimant, that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment was so severe or pervasive enough to affect the terms, conditions, or privileges of employment." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008).

Regarding the "severe or pervasive" element of a *prima facie* case for a Title VII sexual harassment hostile work environment claim, "[t]o be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find offensive, and one that the victim did in fact perceive to be so." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Workplace conduct is not measured in isolation. *Id.* To determine whether a work environment is sufficiently hostile, courts consider the totality of the circumstances including (1) the frequency of the discriminatory

---

[8] Defs.' Mot. Summ. J., Doc. No. 51 at 17.

conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating or merely an offense utterance; and (4) whether it reasonably interfered with the employee's work performance. *Id.* "Title VII, however, is not a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.*

The EEOC has adduced sufficient summary judgment evidence to state a *prima facie* claim for hostile work environment sexual harassment involving a supervisory employee.[9] Claimants, as females, are members of a protected class based on gender. Likewise, the EEOC has alleged and supported with deposition testimony that LJ's conduct was unwelcome.[10] Defendants do not contest either of the foregoing, but assert that LJ's conduct was not based on sex. Defendants further contend that claimants have essentially testified that LJ's conduct was merely offensive, not physically threatening or humiliating, and that it did not rise to the required level of severity or pervasiveness to create a hostile work environment.

"The critical issue in determining whether workplace activities constitute harassment based on sex is 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Reine v. Honeywell Int'l Inc.*, 362 F. App'x 395 (5th Cir. 2010), *cert denied*, (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, (1998)). As discussed in detail below, the EEOC has provided examples of LJ's

---

[9] In 2018, LJ began working as a Co-Manager for SDI Mineola under General Manager, Ty McPherson. Then, in October 2019, SDI Whitehouse hired LJ as the General Manager, where he remained until he was terminated in September 2021. It is undisputed that each claimant worked as a "carhop" or "middle crew member." It is also undisputed that co-managers work under the general manager and supervise hourly employees, including assistant managers, carhops, cooks, and middle workers. Thus, the uncontroverted evidence shows that LJ supervised each of the claimants.

[10] *See e.g.*, Pl.'s Ex. B, Doc. No. 60-2 at *41, 51:20–25; Ex. C, Doc. No. 60-2, at *67, 49:8–21; Ex. D, Doc. No. 60-2 at *89, 53:19–21; Ex. E, Doc. No. 60-3 at *15, 18:4–25; Ex. F, Doc. No. 60-3 at *42–43, 77:18–25, 78:1–24; Ex. G, Doc. No. 60-3 at *73, 40:15–25; Ex. H, Doc. No. 60-3 at *95–96, 33:15–25, 34:1–17.

sexual conduct, directed toward each claimant, and evidence that his sexually harassing behavior was not likewise directed toward men. For example, while LJ would bang on the bathroom door while the male cooks were inside, it was not likewise accompanied by the sexual moaning or "let me in" comments.[11] Further, Defendants did not identify a male employee that LJ also "brushed up against."[12] Accordingly, the record evidence does not demonstrate that LJ was an "equal opportunity" harasser, and a fact issue remains as to whether LJ's actions were based on the claimants' sex. *Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 270–71 (5th Cir. 1998).

As to the "severe or pervasive" element, "[t]here is no mathematical formula to determine whether conduct is sufficiently severe or pervasive to establish a hostile-work-environment claim." *Donaldson v. CDB Inc.*, 335 F. App'x 494, 502 (5th Cir. 2009). Courts consider the totality of the circumstances to determine whether a claim establishes conduct sufficient to be actionable under Title VII. *Id.* at 503. Furthermore, "harassment does not have to be directed toward the plaintiff to be considered for a hostile-work-environment claim." *Id.* at 501. "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007). Frequent incidents that are not severe can also be sufficient. *Id.* "Thus, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Id.* (internal quotation marks omitted). Defendants cite to several cases to support their argument that LJ's behavior did not rise to the required level of severity or pervasiveness to create a hostile work environment.[13] However, in the majority of the cited authorities, the plaintiffs' claims for sexual

---

[11] Pl.'s Ex. A, 50:17–51:12; 61:14–19; Ex. C, 56:4–18.

[12] Pl.'s Ex. H, 67:19–23; Ex. Q, 74:8–15.

[13] *E.g., Hockman v. Westward Communications LLC*, 407 F.3d 317, 328 (5th Cir. 2004); *West v. City of Houston, Tex.*, 960 F.3d 736, 742-43 (5th Cir. 2020); *Ivey v. Brennan*, 770 Fed. Appx. 661, 663 (5th Cir. 2019); *Shepherd v.*

harassment were predicated on the defendants' off-handed remarks or conduct that could best be described as infrequent. Furthermore, unlike the plaintiffs in each of those cases, the claimants in the instant matter were minors at the time of the alleged harassment.[14]

The EEOC has provided enough evidence to survive summary judgment on each claimant's charge as to this element. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 653 (5th Cir. 2012) ("We have held in the context of sex discrimination that harassment of women other than the plaintiff is relevant to a hostile work environment claim.").

- **Vanessa Spurgeon:** Testified that LJ "always" made sexual jokes in front of her and others at work. Ex. F, 77:18. That LJ asked her on dates "a lot of times" and told her that "she could go home with him after the date, and they could give each other massages." Ex. F 78:1¬17. That LJ made jokes about his penis "most days." Ex. H, 23:6–24; 17. That LJ "was right up on [her] body, and that he breathed down [her] neck." Ex. F 82:7–9. That LJ bent down next to her and said "quick, we can kiss, no one's looking." Ex. F 82:14–18. That 2–3 times LJ caressed her hand. Ex. F 84:5–8. Spurgeon also spoke to Morgan, her assistant manager, and told her that LJ's behavior made her uncomfortable.

- **Krystin McElya:** Testified that LJ frequently made sexual jokes Ex. H, 23:2–5. Confirmed that LJ made jokes about his penis "most days." Ex. H, 23:6–24; 17. That LJ brushed against her body "constantly throughout the day." Ex. D, 52:1–5; 55:8–12.

- **Ashleigh Stein:** Testified that LJ made sexual jokes "daily" in her presence. Ex. G, 65:23–25. That LJ asked what her sex life looked like and if she and her boyfriend had

---

Comptroller of Pub. Accounts of State of Tex., 168 F.3d 871, 872-75 (5th Cir. 1999); *Van Pfullman v. Texas Dep't of Transp.,*24 F. Supp. 2d 707, 712 (W.D. Tex. 1998); *Indest*, 164 F.3d at 264; and *Rodriguez v. Flow-Zone, LLC*, No. V-09-54, 2011 WL 2600568, *6 (S.D. Tex. June 29, 2011).

[14] Pl.'s Resp., Doc. No. 60 at 7.

"done anal," and that LJ asked her out on dates a couple of times a month. Ex. G, 66:13. That LJ told her not to "bend over and show anyone [her] vagina because that's supposed to be saved for [him]" before winking at her. Ex. G, 38:14–39:5. That prior to her resignation, LJ's conduct made her so uncomfortable that she developed a "code word" with Assistant Manager Chelsea Newsome so that Newsome could come help her. Ex. G, 73:5–16; 40:15–41:15.

- **Lauren Crump:** Testified that LJ banged on the bathroom door while making moaning sounds and shouting "let me in, let me in" every couple of shifts, Ex. A, 50:17–51:8, and confirmed that he made jokes about his penis "most days." Ex. H, 23:6–24; 17. That LJ grabbed her vagina through her apron. Ex. A, 44:14–20. That LJ brushed past her and grabbed her hips. *Id.* That LJ grabbed her coin machine off her hips. Ex. A 46:14–47:2.

- **Gabrielle Jerome:** Testified that LJ made sexual comments "every single time" she went into work. Ex. C, 55:17–24. Confirmed that LJ made jokes about his penis "most days," and that LJ would bang on the bathroom door while he made lewd sexual moaning sounds, shouting "let me in, let me in." Ex. H, 23:6–24; 17.

- **Sage Mizer:** Testified that LJ made "dirty comments" about female workers in her presence at least "20 times per day." Ex. E, 44:5–15, and confirmed that LJ made jokes about his penis "most days." Ex. H, 23:6–24; 17.

- **Trinity Hollingsworth**[15]**:** Testified that she endured sexually inappropriate comments from LJ "every day, multiple times per day" from October 2018–May 2020. That LJ asked for a "hand job" or "blow job" or "quickie," and suggested that they could make

---

[15] Defendants do not assert that Hollingsworth failed to state a *prima facie* claim. However, her testimony is relevant to determine the existence of a hostile work environment as to the other claimants.

out in the storage room or by the dumpster Ex. B, 52:3–9. That LJ grabbed her from behind on a nightly basis. Ex. B, 52:10–24. That LJ grabbed her vagina through her apron. That LJ forcibly kissed her and held her on his lap.

Given the foregoing, a jury could reasonably determine that LJ's behavior was either pervasive or severe enough to affect the terms and conditions of employment as to each claimant. Accordingly, the EEOC has stated a *prima facie* claim for hostile work environment due to sexual harassment, and Defendants are not entitled to summary judgment on this issue.

### B. Constructive Discharge

Defendants' also move for summary judgment on the EEOC's claims for constructive discharge on behalf of Spurgeon and Stein.[16] A plaintiff alleging constructive discharge must show that her "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). This requires "aggravating factors" resulting in a level of harassment of "greater severity or pervasiveness" than the minimum required to prove a hostile working environment. *Landgraf v. USI Film Prod.*, 968 F.2d 427, 429 (5th Cir. 1992). To determine whether working conditions are sufficiently intolerable, the Fifth Circuit considers whether the plaintiff suffered:

> "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status."

*Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 167 (5th Cir. 2007). "In certain circumstances, a constructive discharge can be considered a tangible employment action that precludes an employer from asserting the *Ellerth/Faragher* defense to vicarious liability."

---

[16] Defs.' Mot. Summ. J., Doc. No. 51 at 6.

*Equal Emp. Opportunity Comm'n v. Big Lots Stores, Inc.*, No. 9:08-CV-177, 2009 WL 10677352, at *6 (E.D. Tex. Oct. 6, 2009).

Here, the EEOC seems to only argue the sixth factor—that LJ's alleged harassment was "calculated to encourage [them] to resign." Defendants state that Spurgeon has worked for Defendant multiple times, and that she previously left because she was graduating and moving to Hawaii. Defendants assert that Spurgeon most recently resigned from SDI Mineola for non-harassment reasons, citing her statement that "everything was fine at work" after LJ left.[17] As to Stein, Defendants assert that although she testified that she quit over a comment made by LJ, Stein also testified that she was already planning on quitting her job due to a family move to Plano.[18] Accordingly, Defendants argue that Spurgeon and Stein did not leave because working conditions were so unbearable.

The EEOC asserts that Spurgeon's statement "everything was fine" is mischaracterized as she also complained that LJ came back to SDI Mineola location twice.[19] The EEOC asserts that Spurgeon quit the night that LJ returned to SDI Mineola in November 2019, following months prior of repeated verbal and physical harassment. The EEOC argues that before she quit, Spurgeon discussed LJ's alleged harassment with McElyea and Hollingsworth in a conversation that was overheard by the male cooks and Assistant Manager Clements. In response, the male cooks called the females "attention whores" and Clements telephoned LJ, prompting LJ to return to SDI Mineola.[20] When LJ arrived, he was yelling and swearing—ostensibly to Clements, but loudly enough to be heard by all—about female employees lying about him. Clements' response to this

---

[17] Defs.' Mot. Summ. J., Doc. No. 51, Ex. 2 (102:23–106:21; 103:22, 106:6–14).
[18] Defs.' Mot. Summ. J., Doc. No. 51, Ex. 8 (38:7–40:14).
[19] Pl.'s Resp., Doc. No. 60; Ex. F (103:19–25).
[20] Ex. F (107:13–110:11).

event was to tell Spurgeon "Ok. No more talking about it."[21] Spurgeon quit that same night. As to Stein, the EEOC asserts that she was forced to resign earlier than planned to avoid sexually predatory behavior. The EEOC asserts that Stein quit after LJ isolated Stein in the back of the store, winked at her, and told her not to "bend over and show anyone [her] vagina because that's supposed to be saved for [him]."[22] The EEOC argues that a constructive discharge claim requires only that working conditions were so intolerable that a reasonable employee would feel compelled to resign; not that the employment must be cut short by a specified amount of time.[23]

Thus, the evidence suggests two possible explanations for both claimant's resignations. Viewing the evidence in the light most favorable to Plaintiff, whether the claimants reasonably felt compelled to quit—especially given their ages at the time—is a fact question for the jury and Defendants are not entitled to summary judgment on this issue. *C.f. Landgraf v. USI Film Prod.*, 968 F.2d 427, 429 (5th Cir. 1992) (no constructive discharge where the evidence showed alternative reasons for plaintiff's resignation and the defendant was taking reasonable action to alleviate the harassment). As discussed below, there is a material dispute regarding Defendants' awareness of the harassment; therefore, there is no evidence of Defendants' attempts to alleviate it.

## C. The Ellerth/ Faragher Affirmative Defense

Defendants argue that even if the EEOC were to establish that LJ's conduct constituted actionable sexual harassment, claimants' hostile work environment claims would fail because Defendants are entitled to summary judgment on their affirmative *Ellerth/Faragher* defense. An employer is strictly liable for harassment by supervisors that "culminates in a tangible employment

---

[21] Pl.'s Resp., Doc. No. 60, Ex. F (112:8–112:25).
[22] Pl.'s Ex. G, 38:14–39:5.
[23] Pl.'s Resp., Doc. No. 60 at 26.

action, such as discharge, demotion, or undesirable reassignment." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (citation omitted). However, where no tangible employment action is taken, the defending employer may ordinarily put forth the *Ellerth/Faragher* affirmative defense. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275 (1998).

Under the *Ellerth/Faragher* defense, even if an employee is able to establish a *prima facie* case for discrimination, an employer will not be vicariously liable if it can prove by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Lauderdale v. Texas Dep't of Criminal Justice*, 512 F.3d 157, 164 (5th Cir. 2007) (quoting *Faragher*, 524 U.S. at 807). Because a tangible employment action may include "the creation of a hostile or abusive working environment," an employer will not be able to take advantage if such an environment was created. *Id.* at 162.

With respect to the first element of the defense, which focuses on the employer's conduct, it is undisputed that Defendants had a detailed "Harassment Policy."[24] Defendants' policy defined sexual harassment, informed employees about why and how they should report it, and assured employees that they would not be retaliated against for reporting harassment.[25] It also made it clear that if the perpetrator was a supervisor, then the employee should report the incident to the next level manager, and it included a number whereby the owners could be reached.[26] However, it is

---

[24] Defs.' Ex. A, Doc. No. 51-1.
[25] *Id.*
[26] *Id.*

also undisputed that while each claimant signed the policy, Defendants retained the document and did not provide claimants with a copy.[27]

Assuming *arguendo* that Defendants' policy was perfectly detailed and well developed, there is still a genuine question of material fact as to whether Defendants exercised reasonable care to prevent and promptly correct any sexually harassing behavior. Defendants have the burden to establish the "reasonable care" element by a preponderance of the evidence. *Faragher*, 524 U.S. at 807. Here, there is conflicting testimony as to Defendants' dissemination of the harassment policy. Defendants assert the policy was publicly posted.[28] However, the EEOC submitted deposition excerpts from claimants and other employees, who either do not remember, or deny that the policy was posted.[29] As there is an obvious conflict regarding this material fact, summary judgment would be inappropriate. *See Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 213 (5th Cir. 2016) (denying summary judgment on the defendant's *Ellerth/Faragher* defense where "the evidence generate[ed] a reasonable inference that the policy was not posted in a conspicuous location given that several employees said they had never noticed it").

Furthermore, the EEOC has adduced summary judgment evidence to create a question of fact regarding whether Defendants properly implemented their policy. For example, when posed with a hypothetical of receiving a complaint of harassment, Cameron McQuilliams said he would not ask anyone to provide a written statement.[30] Likewise, per the policy, Defendants' Managers were the first line of authority that could accept sexual harassment complaints from staff, but prior

---

[27] *See* Pl.'s Resp., Doc. No. 60 at 18 (citing Pl.'s Ex. P, 16:21–23; Ex. F, 57:1–25; Ex. G, 51:8–12; Ex. J, 45:25–46:7, 52:12–23; Ex. H, 43:19–24; Ex. A, 11:6–9; Ex. B, 45:1–2, 46:19–21; Ex. D, 41:18–42:5).
[28] *See* Defs.' Mot. Summ. J., Doc. No. 51 at 21 (citing Ex. 12, 99:23 – 100:18; Ex. 13, 67:25 – 68:5, 70:13-19, 73:10 – 74:8, 120:1-4; Ex. 14, 81:1-22; Ex. 15, 56:17 – 57:7; Ex. 16, 75:14 – 76:8).
[29] Pl.'s Ex. P, 35:6–8, 12–14, 47:9–48:2; Ex. F, 58:22–25; Ex. A, 31:17– 19; Ex. D, 43:7–9; Ex. E, 53:22–54:7, 55:4–8; Ex. C, 40:17–24; Ex. G, 57:12–58:11.
[30] Pl.'s Resp., Doc. No. 60 (citing Ex. N, 28:7–10).

to January 2021, Defendants had never provided the managers with any harassment training.[31] Even after management was purportedly trained, some managers did not know that handling sexual harassment complaints was part of their job or how to do so.[32] Thus, it is unclear, as a matter of law, whether Defendants exercised reasonable care to prevent and promptly correct any sexually harassing behavior.

With regard to the second element of the *Ellerth/Faragher* affirmative defense, which focuses on whether the employee unreasonably failed to take advantage of an employer's preventative or corrective opportunities, the record demonstrates that there is conflicting evidence as to whether the claimants reported the sexual harassment. Defendants assert that despite each Defendant having a written anti-harassment policy, no claimant reported LJ's harassment.[33] The EEOC argues that claimants "attempted to use Defendants' ineffective anti-harassment policy," and asserts that most claimants reported LJ's harassing behavior to multiple members of management.[34] The EEOC asserts that Management acknowledged claimants' complaints but failed to act or believe them. For example, Spurgeon reported LJ's sexual harassment to SDI Mineola Co-Manager, Morgan Lowe.[35] Further, SDI Mineola Co-Manager Charles Clements' overheard Spurgeon's conversation with Trinity Hollingsworth, understood that Spurgeon was "accusing [LJ] of sexual harassment," and reported it to SDI Mineola General Manager Tyrell McPherson.[36] Likewise, Stein told SDI Whitehouse Assistant Manager, Chelsea Newsom, that LJ

---

[31] Pl.'s Resp., Doc. No. 60 at 23 (citing Ex. O, 47:16–19; Ex. L., 43:3–45:5); Defs.' Resp., Doc. No. 60-8 at 20, Request No. 19 ("Admit that Defendant never conducted formal training for its employees on sexual discrimination, sexual harassment, or Title VII during the calendar years 2019 and 2020").

[32] Pl.'s Resp., Doc. No. 60 at 23 (citing *e.g.,* Ex. Q, 28:9–16; Ex. K, 43:15–25).

[33] Defs.' Mot. Summ. J., Doc. No. 51 at 21–22.

[34] Pl.'s Ex. F, 83:2-3, 83:6-12, 87:24-88:3, 90:17-91:7, 92:10-13; Ex. C, 31:5-7; Ex. B, 34:15-24, 35:12-24, 39:18-22, 61:7-62:9; Ex. D, 61:12-62:6, 16-22; Ex. A, 53:20-25; Ex. G, 30:10-18, 41:11-15, 62:20-23, 73:9-16, 115:20-21; Ex. H, 47:18-48:16; Ex. I, 69:17-71:10, 72:5-72:17, 72:18-73:3, 100:19-23, 101:18-20; Ex. Q, 9:3-15, 26:1-20, 27:17-22, 39:19-40:20); (Ex. GG).

[35] Pl.'s Ex. F, Doc. No. 60-3 at 49.

[36] Pl.'s Ex. I, 27:2–15; 100:23–23.

made her uncomfortable.[37] McElyea testified that she reported LJ's sexual harassment to Morgan Lowe, Charles Clements, and Ty McPherson.[38] Hollingsworth testified that Clements knew she felt sexually harassed by LJ.[39]

On this record, the Court cannot determine, as a matter of law, that claimants unreasonably failed to avail themselves of any of the preventative or corrective opportunities provided by Defendant. *C.f. Giddens v. Community Educ. Centers, Inc.*, 540 F. App'x 381, 389 (5th Cir. 2013). In *Giddens*, it was the *combination* of the distributed handbooks and the plaintiff's failure to report established the *Faragher/Ellerth* defense. *Id.* Accordingly, the EEOC has also shown a genuine issue of material fact as to the second element and Defendants are not entitled to summary judgment on their affirmative defense.[40]

### D.  Integrated Enterprise

The EEOC contends that for purposes of Title VII, claimants' "employer" consists of a single "integrated enterprise" operated by the common owners of all thirteen SDI locations—members of the McQuilliams Family—and that Defendants are part of that integrated enterprise. Defendants assert they are entitled to summary judgment on this issue.

The law allows businesses to incorporate to limit liability and isolate liabilities among separate entities. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir. 1997). However, "[i]n civil rights actions, 'superficially distinct enterprises may be exposed to liability upon a finding that they represent a single, integrated enterprise: a single employer.'" *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 763 (5th Cir. 1997) (quoting *Trevino v. Celanese*

---

[37] Pl.'s Ex. Q, 24:13–25:14.
[38] Pl.'s Ex. D, 61:12–25; 62:1–6.
[39] Pl.'s Ex. B 34:19–25.
[40] *Equal Emp. Opportunity Comm'n v. Big Lots Stores, Inc.,* No. 9:08-CV-177, 2009 WL 10677352, at n.5 (E.D. Tex. Oct. 6, 2009) ("Because the constructive discharge claim will proceed to trial and could be considered a tangible employment action which would foreclose application of the *Ellerth/Faragher* affirmative defense, this provides an independent reason for denying [Defendants'] motion for summary judgment on the basis of this defense").

*Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)). Whether two or more entities are engaged in an integrated enterprise for purposes of Title VII is a fact intensive inquiry. *Vance v. Union Planters Corp.*, 279 F.3d 295, 297 (5th Cir. 2002). To determine whether an integrated enterprise exists, courts consider: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Sullivan v. Schlumberger Ltd.*, No. 4:20-CV-00602, 2022 WL 584038, at *2 (E.D. Tex. Feb. 25, 2022). The most heavily weighed *Trevino* factor is whether there is centralized control of labor relations. *Id.* However, no one factor is determinative, and all criteria need not be present. *Id.* "This analysis ultimately focuses on the question whether the parent corporation was a final decision-maker in connection with the employment matters underlying the litigation, and all four factors are examined only as they bear on this precise issue." *Lusk*, 129 F.3d at 777 (internal citations omitted). "Underlying the integrated enterprise test  is  the  requirement  'that  there  be  sufficient  indicia  of  an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer.'" *Glover v. Heart of Am. Mgmt. Co.*, 38 F. Supp. 2d 881, 891 (D. Kan. 1999) (quoting *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1070 (10th Cir.1998)).

Preliminarily, Defendants concede the fourth *Trevino* factor as it is undisputed that SDI Mineola and SDI Whitehouse are separate Texas LLCs with identical membership: Laura & Alvin McQuilliams.[41] Alvin McQuilliams' sons—Eric McQuilliams and Shawn McQuilliams, along with Mike Hamilton, work as "Supervisory Partners" over various McQuilliams-owned SDI locations and report to Cameron McQuilliams who is the "Director of Operations" over all thirteen

---

[41] Pub. Info. R., Doc. No. 60-9 at 9, 15.

McQuilliams-owned SDI locations.[42] Defendants identify them as "Agents of the Owners who work directly for the McQuilliams and are allowed to receive Alvin McQuilliams' would-be share of the profits of the respective entity, in exchange for being the liaison between the owners and the managers of the entity."[43]

The EEOC appears to assert its integrated enterprise theory based primarily on evidence of the interrelationship between the McQuilliams and each of their family-owned SDI locations, including Defendants, as proof that all thirteen McQuilliams-owned SDI locations constitute a single integrated enterprise.[44] Nevertheless, it is undisputed that either SDI Mineola or SDI Whitehouse were claimants' employers, that allegedly discriminated against them by subjecting them to sexual harassment. Thus, to support an integrated enterprise finding between Defendants, or between Defendants and all other McQuilliams-owned SDI locations sufficient to survive summary judgment, the EEOC must demonstrate that under Alvin McQuilliams' management, SDI Mineola[45] and SDI Whitehouse were so "generally intermingled to justify treating them as a single employer." *Vance*, 279 F.3d at 301–02.

### 1. Interrelation of Operations

This factor weighs against summary judgment. Interrelation of operations, "ultimately focuses on whether [one entity] excessively influenced or interfered with the business operations [of the other]." *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997). Evidence that one entity is involved in the "daily employment decisions" of the other is "central." *Schweitzer*, 104 F.3d at 765. The fact that one entity "ultimately benefitted from the activities" of the other "is

---

[42] Dep., Cameron McQuilliams, Doc. No. 60-5 at 22.
[43] Defs.' Ans. Interrog., Doc. No. 60-9 at 3.
[44] *See C.f. Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 591 (S.D.N.Y. May 11, 2020) (collecting cases analyzing whether family-owned businesses were an integrated enterprise—where individuals or parent corporations were also named defendants in an FLSA action).
[45] *See*, Defs.' Corp. Discl., Doc. No. 6 (SDI Mineola "is not owned by any parent corporation").

irrelevant to whether their operations were interrelated." *Lusk*, 129 F.3d at 778. "Attention to detail, not general oversight, is the hallmark of interrelated operations." *Id.* (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 982 (4th Cir. 1987)). Evidence suggestive of interrelated operations includes (1) one entity's involvement in the other's daily decisions relating to production, distribution, marketing, and advertising; (2) shared employees, services, records, and equipment; (3) commingled bank accounts, accounts receivable, inventories, and credit lines; (4) one entity's maintenance of the other's books; (5) one entity's issuance of the other's paychecks; and (6) one entity's preparation and filing of the other's tax returns. *Id*.

The EEOC has put forth summary judgment evidence which demonstrates there is a genuine issue of material fact regarding the second, third, and fifth factors. As to the second factor, the EEOC identified multiple examples where Defendants' employees worked shifts at an SDI location other than the one that employed them,[46] as well as evidence of Defendants' sharing or borrowing of supplies.[47] Likewise, the EEOC provided Texas Workforce Commission ("TWC") records which, according to the EEOC, show that the SDI franchise entities did not pay each Supervising Partner separately:

> According to reports filed by Defendants with the TWC, Cameron McQuilliams was paid wages by only two entities from 2018-2021. During this time, Cameron McQuilliams was paid a total of $2,170,371.31 by SDI Minneola and $48,000 by McQuilliams Investments. *See* Ex. A. Shawn McQuilliams was also paid wages by two entities from 2018-2021, one of which also paid the same fixed wages to Cameron McQuilliams. Shawn McQuilliams was paid $1,822,674.18 by SDI Van and $48,000 by McQuilliams Investments. *See* Ex. B. Mike Hamilton was paid only by SDI Nash. *See* Ex. D. There is no record of Defendants reporting any fixed salary for Hamilton. In contrast, from 2018-2021, Eric McQuilliams was paid by McQuilliams Investments and each SDI location he supervised. These payments

---

[46] Pl.'s Resp., Doc. No. 60 at 7 (citing Pl.'s Ex. M, 62:1– 16; Ex. Q, 18:1–9, 52:2–53:21; Ex. K, 27:24–28:1–14; Ex. P, 23:18–24:6, 24:14–25:6; Ex. O, 23:17–24:9, 52:8–25; Ex. N, 103:17–22); Pl.'s Resp., Doc. No. 60 at 7 (citing Ex. Q, 52:2-53:21); Pl.'s Ex. Q, Doc. No. 60-5 at 24; Pl.'s Ex. K, Doc. No. 60-4 at 27–28.
[47] Pl.'s Resp., Doc. No. 60 at 7 (citing Pl.'s (Ex. M, 30:6–12, 18–25, 33:13–16); Pl.'s Resp., Doc. No. 60 at 7 (citing Ex. O, 44:9–25; Ex. N, 85:24–87:7).

> were much smaller and more numerous that those made by SDI locations to Cameron or Shawn McQuilliams. *See* Ex. C

Pl.'s Mot., Doc. No. 68 at 3–4. Defendants state that "Supervisory Partners receive Alvin McQuilliams' would-be share of the profits for the respective entities they oversee, in exchange for being the liaison between the owners and the managers of the entity."[48]

However, TWC records indicate that Shawn and Cameron McQuilliams received their respective share of the "owner's profit" after it passed through SDI Mineola or SDI Van; not directly from each SDI entity they purportedly supervise.[49] Likewise, Defendants assert Mike Hamilton is paid by six additional franchises; yet TWC records show his share of the "owner's profit" is paid only by or through SDI Nash.[50] This evidence contradicts Defendants' assertion that each SDI entity maintains its own bank account—at a separate bank and does not share funds with any other entity.[51] The foregoing also serves as evidence that SDI Mineola, SDI Van, and SDI Nash are plausibly paying the Supervising Partners on behalf of the other SDI entities. Defendants assert that TWC documents show only that Alvin McQuilliams' entities utilize the IRS' "common paymaster" method to report payments, and that "the money shown paid to Cameron and Shawn in the TWC reports came from the numerous entities listed in Defendants' interrogatory answer 15."[52] Defendants further assert that they utilize the common paymaster method for purposes of withholding, depositing, and paying FICA and FUTA taxes pursuant to "Internal Revenue Code Sections 3121(s) and 3306(p)."[53]

---

[48] Defs.' Ans. Interrog., Doc. No. 60-9 at 3.
[49] Pl.'s Supp. Evid., Doc. No. 68-5, Exs. A, B.
[50] Pl.'s Supp. Evid., Doc. No. 68-5, Ex. D.
[51] Defs.' Mot. Summ. J., Doc. No. 51 at 31 (citing Ex. 9 63:1–9; Ex. 17 22:14–23:8; Ex. 14, 24:2–22).
[52] Defs.' Resp. Opp. Pl.'s Mot. Leave Supp. Summ. J. Evid., Doc. No. 71 at 5.
[53] Defs.' Resp. Opp. Pl.'s Mot. Leave Supp. Summ. J. Evid., Doc. No. 71 at 5.

Section 3121(s) of the Internal Revenue Code—Concurrent employment by two or more employers—provides:

> For purposes of sections 3102, 3111, and 3121(a)(1), if two or more *related corporations* concurrently employ the same individual and compensate such individual through a common paymaster which is one of such corporations, each such corporation shall be considered to have paid as remuneration to such individual only the amounts actually disbursed by it to such individual and shall not be considered to have paid as remuneration to such individual amounts actually disbursed to such individual by another of such corporations.

26 U.S.C.A. § 3121 (West) (emphasis added). Based on the totality of the foregoing evidence, viewed in the light most favorable to Plaintiff, a genuine issue of fact remains, and this factor weighs against summary judgment.

### 2. *Centralized Control of Labor Relations*

This factor also weighs against summary judgment. Suitable evidence of centralized labor and employment decisions includes [one entity's] control of hiring, firing, promoting, paying, transferring, or supervising employees of the [other]. *Johnson,* 814 F.2d at 982. "The fundamental inquiry is whether there exists overall control of critical matters at the policy level, not whether there is control over day-to-day labor decisions." *Alcoa, Inc. v. Nat'l Labor Relations Bd.*, 849 F.3d 250, 258 (5th Cir. 2017) (quotation marks omitted). Ultimately, this factor is reduced to the single question of: "[W]hat entity made the final decisions on employment matters regarding the person claiming discrimination?" *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918 (5th Cir. 2021) (emphasis added), *cert. denied,* 142 S. Ct. 563, 211 L. Ed. 2d 351 (2021). As previously discussed, this case does not involve a parent-subsidiary relationship and no other McQuilliams-owned entity or member of the McQuilliams Family is named as a Defendant. Thus, the relevant inquiry is whether, through the McQuilliams' management, SDI Mineola may be held liable for

the final employment decisions made regarding claimants employed by SDI Whitehouse or vice versa.

It is undisputed that the McQuilliams promulgated policies which were shared between all SDI locations, including the anti-harassment policy and "McQuilliams List of Rules."[54] It is also undisputed that the McQuilliams hired SDI general managers by looking first to the pool of experienced employees at their various SDI locations.[55] For example, LJ was "promoted" from co-manager at SDI Mineola to general manager at SDI Whitehouse and Newsom was "promoted" from assistant manager at SDI Whitehouse to co-manager at another location.[56] The general manager for each SDI location set the work schedules and directed work assignments for each employee, including claimants, and handled the hiring and firing of employees at each location without the requirement to first seek the McQuilliams' approval.[57] *Bruce v. Olde England's Lion & Rose Rim, LLC*, No. SA-20-CV-00928-XR, 2021 WL 4953910, at *9 (W.D. Tex. Oct. 25, 2021) ("The ability of general managers [] to hire and terminate employees without [the owner's] approval indicates a lack of centralized labor relations").

However, the evidence also demonstrates that the McQuilliams had the power to fire employees. *See Perry*, 990 F.3d at 918 ("The power to request removal of an employee generally favors a finding that an integrated enterprise exists"). Moreover, the evidence shows that the McQuilliams made the final employment decisions regarding LJ. Given the allegations of harassment in this case, a reasonable juror could conclude that the McQuilliams' decisions to hire and later promote LJ, coupled with their promulgation and control of Defendants' anti-harassment

---

[54] Pl.'s Resp., Doc. No. 60 at 31–32 (citing Ex. O, 44:9–25; Ex. N, 85:2–86:6).
[55] Pl.'s Resp., Doc. No. 60 at 30 (citing Ex. O, 44:9–25; Ex. N, 85:2–86:6).
[56] Pl.'s Resp., Doc. No. 60 at 30, Ex. Q 13:2–14:11.
[57] Defs.' Mot. Summ. J., Doc. No. 51 at 4 (citing Ex. 9, 31:14–32:1, 41:1–3, 61:11–15).

policy, are inextricably linked to the employment decisions regarding claimants. As that is the primary inquiry, this factor weighs against summary judgment.

### 3. *Common Management*

This factor is neutral. Under this factor, the Court considers whether the entities have common officers, directors, and managers. *Maradiaga v. Intermodal Bridge Transp., Inc.*, No. 3:10-CV-1028-L, 2011 WL 856872, at *3 (N.D. Tex. Mar. 11, 2011). However, the mere existence of common management is insufficient to allow the inference that the entities operate as an integrated enterprise. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779–81 (5th Cir. 1997) ("Officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."). The key inquiry is "whether the common officers or managers exert regular control, *i.e.,* day-to-day, over the operations of both entities." *Id.*

It is undisputed that the McQuilliams hired Defendants' general managers. Further, the evidence shows that the Supervisory Partners[58] managed the general managers for each SDI entity; including resolving disputes which involved the general managers and supervised and directed the general policies and procedures at each location.[59] Thus, the EEOC has demonstrated that the McQuilliams acted as final decision-makers in connection with the decision to promote LJ from co-manager for SDI Mineola to general manager for SDI Whitehouse. Yet, there is no evidence that the McQuilliams managed the *day-to-day* activities of each entity, nor any evidence of overlap in the managerial responsibilities for Defendants' general managers. *See Walker v. Toolpushers*

---

[58] As agents of the owners, Cameron, Shawn, and Eric McQuilliams along with Mike Hamilton are analogous to corporate officers. Defs.' Ans. Interrog., Doc. No. 60-9 at 3.
[59] Pl.'s Resp., Doc. No. 60 at 32.

*Supply Co.*, 955 F. Supp. 1377, 1384 (D. Wyo. 1997) (citing *Schweitzer v. Advanced Telemarketing Corp.,* 104 F.3d 761 (5th Cir. 1997) ("common officers do[] not translate into common management"). Accordingly, this factor is neutral.

### 4. *Common Ownership*

Defendants concede common ownership.[60]

### 5. *Conclusion*

In short, the EEOC has presented summary judgment evidence which indicates interrelatedness of operations, common ownership, centralized control of labor relations, and to some degree, common management. Accordingly, this evidence is sufficient to create a genuine issue of material fact and Defendants are not entitled to summary judgment on this issue.

### E.  Non-economic Damages

Defendants assert they are entitled to summary judgment as to Plaintiff's claim for non-economic damages on behalf of Spurgeon, McElyea, Crump, and Mizer. Defendants argue that claimants fail to state a specific discernable injury to their emotional state, that is supported with competent evidence regarding the nature, extent, and duration of the alleged harm they have claimed to sustain as a result of the alleged sexual harassment.[61] Any award for emotional injury greater than nominal damages must be supported by evidence of the character and severity of the injury to the plaintiff's emotional well-being. *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 488 (5th Cir. 2001). "In certain cases, a plaintiff's testimony alone may be sufficient proof of mental damages." *Id.* (internal quotations and citations omitted). "Hurt feelings, anger and frustration are part of life ... and [are] not the types of harm that could support a mental anguish award. However,

---

[60] Common ownership or financial control is insufficient by itself to support a finding that two corporations constitute a single employer. *Lusk,* 129 F.3d at 778.
[61] Defs.' Mot. Summ. J., Doc. No. 51 at 23.

"[c]ompensable emotional distress may manifest itself as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue, or a nervous breakdown." *Stephens v. City of Dallas*, No. 3:10-CV-191-O, 2013 WL 12250348, at *9 (N.D. Tex. Mar. 25, 2013).

Here, the EEOC provided deposition testimony from each claimant including references to specific symptoms and accompanying examples of how the emotional harm manifests itself. Spurgeon testified that she has developed trust issues, has lost sleep, and has suffered humiliation and anxiety.[62] Hollingsworth testified that she has developed a mistrust of men, has become hyper-vigilant, suffers from depression and anxiety, and has lost approximately 70 pounds.[63] McElyea testified that she feels uncomfortable in her own skin and hyper-vigilant as a result of the times that LJ harassed her and brushed up against her in the Sonic restaurant.[64] McElyea also testified that she has stopped hugging members of her own family and became uncomfortable and guarded at her next place of employment when a man made an inappropriate comment.[65] Stein testified that she does not feel like herself and has avoided physical contact, including hugging her father or grandfather.[66]

Stein also testified that LJ's sexual harassment exacerbated her anxiety and eating disorder to the point that while working for SDI Whitehouse, she was so anxious that she vomited every shift.[67] Mizner testified that she is extremely self-conscious about her body because of the comments LJ made to her and that she was afraid to meet new people or interview for a new job.[68] Jerome testified that the harassment she endured worsened her anxiety to the point of experiencing

---

[62] Pl.'s Ex. F, Doc. No. 60-3 at 60.
[63] Pl.'s Ex. B, Doc. No. 60-2 at 54–55.
[64] Pl.'s Ex. BB, Doc. No. 60-8 at 92.
[65] Pl.'s Ex. D, Doc. No. 60-2 at 98–99.
[66] Pl.'s Ex. G, Doc. No. 60-3 at 88.
[67] Pl.'s Ex. CC, Doc. No. 60-8 at ⁋ 4.
[68] Pl.'s Ex. E, Doc. No. 60-3 at 23–24.

anxiety attacks and said that she believes the experience "stayed with her" and triggered something in her.[69] Crump testified that as a result of LJ's harassment, she feels uncomfortable working around men and that she has developed a poor body image, and takes care to choose loose-fitting clothing.[70] Accordingly, viewing the evidence in the light most favorable to the EEOC, the record evidence is sufficient to show that the harassment caused some discernable injury to claimants' mental state and Defendants are not entitled to summary judgment on this issue. *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 402 (5th Cir. 2007) ("A claimant's testimony, without more, may support an award of compensatory damages for emotional distress").

### F. Punitive Damages

Likewise, Defendants assert they are entitled to summary judgment on the issue of punitive damages. "An employer is liable for punitive damages in a Title VII action if: (1) its agent is employed in a position of managerial capacity, (2) the agent acts within the scope of employment, and (3) the agent acts with malice or reckless indifference towards the federally protected rights of the plaintiff." *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535–45(1999). However, such liability may not be imputed if the agent's actions are contrary to the employer's good faith effort to comply with Title VII. *Id.* at 545. "Ultimately, the terms 'malice' and 'reckless indifference' focus on the actor's state of mind." *Wantou v. Wal-Mart Stores Texas, L.L.C.,* 23 F.4th 422, 439 (5th Cir. 2022) (quoting *Kolstad*, 527 U.S. at 535, 119 S.Ct. 2118). "Both pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination [or retaliatory conduct]." *Id.* "Thus, the defendant employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable for punitive damages." *Id.*

---

[69] Pl.'s Ex. C, Doc. No. 60-2 at 74–77.
[70] Pl.'s Ex. A, Doc. No. 60-2 at 24–25, 28.

It is undisputed that LJ served Defendants in a managerial capacity, and LJ testified that he thought his actions amounted to sexual harassment.[71] Further, the evidence establishes that LJ knew that sexual harassment was a violation of federal law.[72] As noted above, an employer may escape vicarious liability for the discriminatory employment decisions of managerial employees where those decisions are contrary to the employer's good faith efforts to comply with Title VII. However, the Supreme Court in *Kolstad* did not define the contours of what measures constitute "good faith efforts," recognizing only that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms" and "the purposes underlying Title VII are similarly advanced where employers are encouraged to adopt anti-discrimination policies and to educate their personnel on Title VII's prohibitions." *Kolstad*, 527 U.S. at 545.

Defendants assert that they could not have acted with malice or reckless indifference when no owner or member of upper management had knowledge of the conduct at issue. However, a reasonable jury could infer that Defendants acted in the face of a perceived risk and violation of each claimants' rights under Title VII. The existence of a written anti-discrimination policy, standing alone, does not insulate an employer from vicarious liability by establishing it made good faith efforts to comply with Title VII. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 283 (5th Cir. 1999) ("[E]vidence of a faithfully-adhered-to non-discrimination policy may bar imputing punitive damages liability to an employer when its employee acts with malice or reckless indifference."). That Defendants had a policy forbidding sexual harassment and a procedure for investigating such complaints is insufficient to shield them from the consequences of LJ's harassing behavior; especially in light of the conflicting testimony regarding its promulgation and the lack of managerial training and awareness surrounding it. Accordingly,

---

[71] Pl.'s Ex. J, 62–63, 164.
[72] Pl.'s Ex. J, 62–63, 164.

because genuine issues of fact of remain, Defendants are not entitled to summary judgment on the issue of punitive damages.

**RECOMMENDATION**

For the foregoing reasons, the Court **RECOMMENDS DENYING Defendants' Motion for Summary Judgment** (Doc. No. 51).

Within fourteen days after receipt of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the Magistrate Judge. 28 U.S.C. § 636(b). A party's failure to file written objections to the findings, conclusions, and recommendations contained in this Report within fourteen days after service shall bar that party from de novo review by the District Judge of those findings, conclusions, and recommendations, and except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Auto. Assn.,* 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), *superseded by statute on other grounds,* 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 17th day of August, 2022.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE